# FILED

NOV 1 4 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KNOWLES ELECTRONICS, LLC, | **06CV6213** |
| Plaintiff, | **JUDGE GRADY** |
| VS. | **MAG. JUDGE VALDEZ** |
| AMERICAN AUDIO COMPONENTS, INC., AAC ACOUSTIC TECHNOLOGIES HOLDINGS, INC., GENERAL MEMS CORPORATION, NAN ZHANG, individually and as employee and agent of GENERAL MEMS CORPORATION, MARK WANG, individually and as employee and agent of GENERAL MEMS CORPORATION, and DOES 1-25, inclusive, | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants. | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Now comes the Plaintiff, KNOWLES ELECTRONICS, LLC ("Knowles"), and complains of Defendants, AMERICAN AUDIO COMPONENTS, INC. ("AAC"), AAC ACOUSTIC TECHNOLOGIES HOLDINGS, INC. ("AACATH"), GENERAL MEMS CORPORATION ("General MEMS"), NAN ZHANG, individually and as employee and agent of General MEMS ("Zhang"), MARK WANG, individually and as employee and agent of General MEMS ("Wang"), and DOES 1-25, inclusive, as follows:

### INTRODUCTION

1.     Knowles, a Delaware limited liability company with its principal offices located in the northwest Chicago suburb of Itasca, invested multiple millions of dollars and years of man hours researching and developing a technology deemed to be "disruptive" by the industry, meaning that it constitutes a revolution in technology in its field – a complete departure from prior technology - not simply an updated version or generation of the prior product.

2.    The disruptive technology at issue relates to a silicon microphone which consists of a semiconductor element, a microphone diaphragm made of silicon produced using the Micro-Electro-Mechanical Systems, or "MEMS," process, and a unique and proprietary packaging system combining all in a single device. The MEMS based silicon microphone technology significantly improves manufacturability, environmental stability, reliability, and reduces assembly costs while significantly reducing the size of the microphone. Knowles sells the silicon microphone, also known as the MEMS microphone, under the trade name "SiSonic." This technological advancement is estimated to be worth a billion dollars in sales over the next few years.

3.    AAC, a Hong Kong corporation doing business in the United States, has engaged in a purposeful concert of action to obtain secret manufacturing choices and procedures, and product specifications, relating to this new 'disruptive' MEMS microphone and system package, but not through fair competition or its own research and development. Knowles, having labored hard to produce a revolutionary technology that competitors have been unable to successfully develop and/or incorporate into a microphone system, should enjoy this window of exclusivity without having its profits raided by piracy.

4.    AAC has been so brazen in its efforts to secure MEMS technology and deliver a MEMS based silicon microphone that it has targeted and solicited key employees in the Knowles organization, openly advising them to blatantly disregard their noncompete and nondisclosure agreements. Utilizing a web of former Knowles employees and third parties both here and in China, AAC gained key trade secret and proprietary information regarding Knowles' successful manufacturing choices and procedures, production specifications, key employees, vendors and pricing through an ongoing series of communications including emails and meetings in Illinois,

2

California and China. This ill-gained information saved AAC years of labor and millions of dollars.

5.     To fill the gap in its expertise, AAC financed a small California company, General MEMS, which on information and belief is owned by persons closely associated with the management of AAC, to serve as its captive design firm, with General MEMS assisting AAC on copying the manufacturing choices and procedures and product specifications to produce the complete device. AAC conveyed the stolen design and process information to General MEMS, who not only accepted it, but knowingly and repeatedly participated in clandestine meetings with AAC's head designers and a former high-ranking management official in the Knowles organization still under noncompete and nondisclosure agreements with Knowles to discuss status on development and problems arising therefrom. This former senior Knowles employee would then provide secret and proprietary information currently known to him or relay questions to and gain answers from a key Knowles engineer in China, and in turn provide the protected information to AAC who, together with General MEMS, would utilize the information. AAC procured this assistance from current and former Knowles employees through lucrative employment offers which were based on proprietary information regarding their employment packages at Knowles.

## PARTIES

6.     Plaintiff Knowles is, and at all relevant times was, an international acoustical manufacturer and a Delaware limited liability company whose principal place of business is at 1151 Maplewood Drive in Itasca, Illinois. Knowles maintains its headquarters in Itasca, Illinois and until on or about 2004 maintained its silicon microphone production and development center in Itasca, Illinois. In addition, Knowles manages manufacturing facilities in China and elsewhere.

7.     Knowles is a leading world-wide manufacturer of electronic components such as microphones and speakers for use in various products such as hearing aids and cell phones. In 2003, Knowles successfully introduced the revolutionary MEMS based silicon microphone product, the product of more than 10 years of intensive and extremely costly research and development, which includes as a semiconductor element with silicon diaphragm sometimes known as a "MEMS" device. Silicon microphone technology integrating MEMS is rapidly replacing the traditional microphone used in devices such as cellular telephones, digital cameras, PDAs, personal computers, and other consumer electronic devices on a global scale.

8.     Defendant AAC is, at all relevant times, a Hong Kong corporation whose principal place of business in the United States is at 1920 Wright Avenue in La Verne, California.

9.     AAC is an acoustics manufacturing firm. AAC is a large scale manufacturer of miniature acoustic components and supplies a full range of speakers, receivers, transducers, microphones, headsets and vibrators for various industries. AAC's California office holds the company's U.S. based engineering design center. Like Knowles, AAC maintains manufacturing facilities throughout China. On information and belief, Brad A. Lemer is an AAC employee and acoustics engineer who conducted business affairs in Illinois related to this dispute, including meetings with Jeffrey A. Fenn ("Fenn"), regarding silicon microphone technology.

10.     Defendant General MEMS is, and at all relevant times was, a California corporation whose principal place of business is at 1270 Oakmead Parkway, Suite 101, in Sunnyvale, California. General MEMS is a supplier of acoustic MEMS sensors products and design services for the telecommunications industry. On information and belief, General MEMS is owned by three individuals who, on information and belief, are closely associated with the

4

senior management of AAC and one of whom is a professor at Stanford University. On information and belief, General MEMS employs six individuals including the three owners.

11.     Defendant Zhang is, and at all relevant times was, an owner and President of General MEMS, and conducted the business affairs of General MEMS in Illinois and California.

12.     Defendant Wang is, and at all relevant times was, an owner and Chief Executive Officer of General MEMS, and conducted the business affairs of General MEMS in Illinois and California.

13.     On information and belief, Pierre Khuri-Takub is an owner and officer of General MEMS, and is also a professor at Stanford University in Palo Alto, California. On information and belief, this individual conducted the business affairs of General MEMS in Illinois and California, including utilizing misappropriated trade secret and proprietary information for development of prototypes at a laboratory at Stanford University to which said individual has access and/or over which said individual has control.

14.     Plaintiff does not know the true identity or specific capacities, whether individual, corporate, associate, or otherwise, of Defendants named as Docs 1 to 25, and has therefore sued them by such fictitious names. Upon discovery of their true identities, Plaintiff will seek leave to amend this complaint to show their true names and capacities, together with appropriate allegations of wrongdoing.

15.     Plaintiff is informed and believes, and on that basis alleges, that DOES 1 to 25 were responsible in some manner for the events and happenings set forth herein. It shall be deemed that whenever and wherever in this Complaint any Defendant, whether specifically named or not, is the subject of any charging allegation, that DOES 1 to 25 are likewise the subject of that charging allegation.

5

## JURISDICTION

16.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17.     This Court has jurisdiction over Defendants, pursuant to the provisions of the Illinois long-arm statute 735 ILCS 5/2-209 because Defendants conducted business within Illinois and the Northern District of Illinois, Eastern Division.

## BACKGROUND FACTS

18.     The acoustics industry is fiercely competitive with rapid technological development and short product life cycles. Companies in this area strive to be the forerunner to research, development, patent creation, and manufacturing technology and to penetrate the market with their new products. As a result, measures are taken by companies for purposes of protecting their research and development, trade secrets, confidential and proprietary information.

19.     With respect to trade secrets and confidential proprietary information, Knowles makes reasonable efforts to maintain their confidentiality. For example, all Knowles employees, including those employees involved in the MEMS microphone process, are subject to agreements to keep said information confidential. In particular, Knowles requires that each of its employees, regardless of their position, sign and execute an Invention/Non-Disclosure Agreement, a Non-Competition Agreement and a Security Information Agreement as a condition precedent to his/her employment.

20.     Knowles derives economic value from the maintenance of the confidentiality of its trade secrets and confidential information, particularly those trade secrets and confidential information related to the silicon microphone   Armed with such information, Knowles'

6

competitors could: (a) cut years off the time necessary to identify and correct design flaws on constructing a successful silicon microphone including but not limited to the manufacturing choices and procedures and production specifications relating to the MEMS microphone and system package; (b) cut months if not years off the time necessary to identify and cultivate business relationships with essential vendors of the silicon microphone components; (c) devise competitive programs to underbid Knowles for sales, armed with Knowles' client-specific and vendor-specific pricing and cost structure; (d) develop programs to better target and recruit key Knowles' employees specially trained for the silicon microphone technology armed with knowledge of their skills, training, position and compensation; (e) utilize information regarding Knowles' marketing strategy and business plan; and (f) develop strategies for interrupting Knowles' vendor and customer relationships. Thus, disclosure of such information will cost Knowles multiple millions of dollars in lost revenues and lost market share in what is a one billion dollar per year microphone market.

21.    On or around October 2001, Knowles hired Fenn, an Illinois citizen and resident, as the Director of Rapid Prototype Development at Knowles' Itasca manufacturing facility. Fenn executed Invention/Non-Disclosure Agreement, Non-Competition Agreement and Security Information Agreement (collectively "Agreements") dated October 11, 2001. *(See Agreements attached hereto as Exhibits A, B and C, respectively).*

22.    In late 2003, Fenn accepted an expatriate assignment as General Manager, responsible for transferring silicon microphone assembly operations from the US to Suzhou, China. Fenn's initial responsibilities focused on recruiting Chinese engineers and coordinating an inpatriate training program at Knowles corporate facility. In July 2004, Fenn moved to Suzhou, China and began his expatriate assignment as the resident General Manager. In his

7

capacity as General Manager, all five functional departments of the operation in China, namely Production, Manufacturing, Engineering, Equipment Engineering, Quality and Matrix Supply Chain, reported to him. As a result of his position, Fenn knew the entire China organizational chart, as well as the names of the research and development employees in the U.S. Fenn conducted weekly quality meetings in which the professional level employees reported to Fenn and updated him personally regarding their work. He was involved in the hiring of nearly every professional level employee in Knowles' China silicon microphone operations. Fenn knew the breakdown of the system in China better than any other individual, including the technical, leadership and language skills of each Knowles' professional involved in the silicon microphone production.

23.     The Agreements included in part that Fenn "hereby **agrees to refrain from disclosing to any third person or using for the benefit of himself or any third person from the dates hereof through the period of his employment by the Company *and thereafter*, any confidential information or facts or trade secrets obtained or learned by him during and in connection with his employment."** *(Emphasis added.)(See Invention/Non-Disclosure Agreement at Section 3 attached hereto as Exhibit A).*

24.     At the time Fenn signed the Agreements, Fenn acknowledged that he could not remove the schematics of any trade secrets or confidential information including and not limited to the silicon microphone technology in the course of his work and that such information could not be shown to outsiders.

25.     On or around 1990, Knowles began to research and develop the silicon microphone technology. Knowles invested millions of dollars in research and development of this product, recruited engineers in the new MEMS microphone technology, and built a MEMS

8

microphone factory in Suzhou, China. After years of dedicated, painstaking effort, during which Knowles patented many aspects of its new product and developed a significant portfolio of confidential information and trade secrets, it was on the verge of revolutionizing the acoustics industry.

26.     In 2003, Knowles traveled into unchartered territory and unveiled a silicon microphone to the acoustics industry quickly becoming the leading provider of MEMS acoustic components in 2004.

27.     At all times material, Fenn was a trusted employee and key component in the manufacturing of the silicon microphone. Fenn recruited, interviewed and hired a majority of the silicon microphone manufacturing team which consisted of highly skilled engineers and operators. Said employees were brought from China to Knowles' headquarters in Illinois for 6-months of intense, specialized orientation and training regarding the silicon microphone.

28.     Fenn worked for Knowles for the next several years as General Manager of Knowles' Silicon Microphone manufacturing facility in Suzhou, China. During that time, not only did Fenn gain valuable knowledge and experience related the silicon microphone, Fenn had access to and acquired Knowles concrete trade secrets and confidential information related to the silicon microphone which included price lists, supply list, business policies, procedure manuals, manufacturing choices and procedures, and production specifications.

29.     Fenn's employment term with Knowles ended on December 31, 2005.

30.     On or around September 2006, Knowles became suspicious that Fenn may have violated his Non-Compete and Non-Disclosure Agreement. As such, Knowles contacted Fenn regarding the possible leakage of silicon microphone trade secrets and confidential proprietary information in their industry.

9

31.     On or around September 2006, Fenn conceded to Knowles that he disclosed trade secrets, confidential and proprietary information to Defendants regarding the silicon microphone in violation of his Agreements. Specifically, Fenn conceded that Defendants requested technical information, which he provided both orally and in writing, regarding but not limited to the following:

>    a) General project planning for the silicon microphone;
>
>    b) Spreadsheet head count for various volumes;
>
>    c) Various technical job descriptions and names of key MEMS trained personnel;
>
>    d) Identification of numerous vendors and purchase prices for silicon microphone materials;
>
>    e) Component specifications for the silicon microphone;
>
>    f) Baking specifications for the silicon microphone;
>
>    g) Defect modes for the silicon microphone;
>
>    h) Identification of various costs to produce the silicon microphone; and
>
>    i) The cleaning process for the silicon microphone.

32.     The above disclosed information is proprietary information which is virtually impossible to duplicate without resorting to gaining it through improper means. Knowles' competitors have been unable to efficiently compete and overcome their own design flaws and limitations to successfully produce and package silicon microphone technology. As a result, Knowles derives great economic value from its successful introduction of the silicon microphone into the consumer electronics industry. Knowles takes reasonable steps to maintain the secrecy of its trade secrets and confidential information related to the same.

33.     Prior to September 2006, Fenn was not forthcoming regarding his relationships with Defendants, his awareness of AAC and the other Defendants calculated and continuous

conduct to misappropriate trade secrets from Knowles related to the MEMS microphone and AAC's intention to steal key Knowles' employees who were specially trained in the MEMS microphone technology. In late October, Fenn divulged substantial additional information revealing the web of individuals involved with Knowles and the Defendant's organizations and the blatant steps taken to misappropriate the technology thus accelerate AAC's entry into this lucrative market.

## DEFENDANTS COURSE OF INTENTIONAL AND MALICIOUS CONDUCT IN WHICH THEY MISAPPROPRIATED MEMS MICROPHONE TRADE SECRETS AND POACHED KEY KNOWLES' EMPLOYEES

34.     Prior to the end of Fenn's employment at Knowles, Fenn began calling his industry contacts with the goal of finding a job offer. On or around November of 2005, while still employed by Knowles, Fenn contacted KY Du ("Du") the Chief Operating Officer for AAC. Fenn and Du previously established a relationship when both individuals were employed by Motorola several years prior and had remained in contact.

35.     In violation of Fenn's Agreements, on information and belief, in November 2005, Fenn and Du met in person and discussed Fenn's prospects with AAC. Specifically, Du discussed AAC's current acoustics technology and financial statements and noted his desire to add the silicon microphone to AAC's portfolio. As of that date, AAC had no such product.

36.     After that meeting, Fenn felt somewhat apprehensive regarding his Agreements with Knowles and expressed such concerns to Du and AAC.

37.     Du requested that Fenn send him a copy of his Agreements with Knowles for purposes of permitting Du and AAC's attorneys to review such materials. Fenn sent Du and AAC his Agreements with Knowles on or around December of 2005.

11

38. Shortly thereafter, Du and various AAC agents, intentionally, willfully, fraudulently, maliciously and with the intent to gain trade secrets and confidential information, advised Fenn that AAC's attorneys reviewed the Agreements and concluded that his Agreements were invalid and unenforceable.

39. After that time, Du and various AAC agents actively communicated with Fenn and further discussed the technical aspects of the silicon microphone technology. Again, AAC, through its agents and employees, expressed its desire to gain access to such information in order to become a competitor in the silicon microphone marketplace.

40. AAC, through its agents and employees included but not limited to Du, Benjamin Pan (AAC Chief Executive Officer), Mr. Meng (AAC head of development), Mr. Dee (operations manager for AAC in Shenzhen, China), and Mr. Larry Li (program/project manager for AAC), pressured Fenn to identify top Knowles employees and personnel with silicon microphone training. Pan, Du, Meng and Dee continued to express their desires to establish a silicon microphone factory in either Suzhou or Shenzen, China and needed specially trained employees to step into leadership positions running the manufacturing facility. As of that date, AAC still had no successful silicon microphone product.

41. Eventually, Fenn provided Du with the names and contact information of several key employees who were intimately involved in the MEMS process at Knowles: Kane Zheng, Adrian Zhu, and others. These individuals were selected because they possessed the requisite knowledge, training and leadership skills to run the three arms of the silicon microphone process, specifically quality, manufacturing and equipment maintenance Du hoped to hire at least one Knowles employer from each arm.

12

42.     On information and belief, Du and various AAC agents and employees, purposely and actively contacted each of the above referenced Knowles employees with the intention to pirate these employees into AAC's employment and to induce them to provide AAC with Knowles' trade secret and proprietary information regarding the silicon microphone technology.

43.     Specifically, on information and belief, Du and various AAC agents and employees, contacted Adrian Zhu ("Zhu") for purposes of gaining his known trade secrets and confidential information related to Knowles' silicon microphone. Zhu, known as one of the pioneers, was one of the initial engineers and members of the silicon microphone team who received extensive orientation and training from Knowles.

44.     Like Fenn, Du and AAC's agents and employees intentionally, willfully, fraudulently, maliciously and with the intent to gain trade secrets and proprietary information, advised Zhu that AAC's attorneys reviewed his Agreements and concluded that his Agreements were invalid and unenforceable. On information and belief, Zhu resigned from his position at Knowles in August 2006 and began employment with AAC in China in violation of his Agreements. On information and belief, Zhu resigned from AAC in October 2006 after Knowles became aware of his employment.

45.     In February, 2006, Fenn received a formal offer of employment from AAC to serve as Vice President of Shenzhen Operations. Fenn would be responsible for making AAC a global competitor through the addition of silicon microphone technology into AAC's portfolio. His duties and responsibilities would include acting as the *de facto* general manager of AAC silicon microphone manufacturing facility in China, inevitably, and intentionally relying upon

13

the exact trade secret and confidential proprietary information that he relied upon when he was employed as General Manager of Knowles' silicon microphone manufacturing facility in China.

46.     Without a confirmed start date, Fenn returned to the Chicago area and accepted his offer with AAC in March, 2006.

47.     Defendants' plan progressed over the following month. Knowing Fenn was located in the Chicago area, Du requested that Fenn attend several meetings in the Chicago area with one of AAC's employees, Lemer. Lemer was/is an engineer for AAC who maintained a sales and technical support office in the Chicago area for AAC. Du and other AAC agents and employees urged Fenn to meet with Lemer and believed that it was ideal for Fenn and Lemer to discuss silicon microphone manufacturing and related details.

48.     These meetings took place in Illinois wherein Fenn and Lemer discussed issues related to the silicon microphone.

49.     Over the course of the next several months, AAC continued to conspire to misappropriate trade secrets and confidential information related to the silicon microphone. As part of AAC's calculated plan, AAC's agents and employees, including Lemer, organized meetings and business trips in which Fenn would meet with several high ranking professionals and designers throughout the AAC structure in both the United States and China.

50.     Utilizing Fenn and Lemer's trust and established relationship, Pan, Du and Lemer conducted several meetings with Fenn at AAC's headquarters and design center in La Verne, California. These meetings were scheduled with the specific purpose to inform Fenn of AAC's progress with its silicon microphone product and, in turn, for Fenn to provide information responding to and solving design problems.

51.    At the initial meeting, Fenn was accompanied by Lemer and was subsequently introduced to various AAC agents. The purpose of the meeting was to give Fenn an opportunity to assist AAC in choosing a MEMS supplier. Fenn, Lemer and the other present AAC agents, actively engaged in discussions regarding AAC's design and manufacturing needs for the silicon microphone. As of that date, AAC still did not have a commercially viable silicon microphone product which was production ready.

52.    At that same meeting, Fenn, Lemer and other AAC agents traveled to Stanford University and toured its laboratory where silicon microphone research was being performed by or at the direction of one of General MEMS owners specifically for AAC. On information and belief, AAC and Stanford University, collectively, utilized misappropriated trade secret and proprietary information to further advance AAC's desire to access the silicon microphone marketplace.

53.    At a second meeting in California, Fenn and various AAC agents met with AAC's chosen MEMS semiconductor element with a silicon diaphragm supplier, General MEMS.

54.    Upon information and belief, General MEMS, through its owners, Zhang and Wang, markets itself as a company that specializes in acoustic and RF MEMS products development and teams up with major acoustic component suppliers to commercialize MEMS based microphones and speakers for cell phone industry and also establishing joint ventures with overseas companies to develop and market MEMS sensors.

55.    Shortly after this meeting, General MEMS informed AAC that it had a silicon microphone product design and process ready for AAC's manufacturing.

56.    On information and belief, AAC and General MEMS conspired to gain and utilize misappropriated trade secrets and confidential proprietary information obtained by AAC for

15

purposes of copying the manufacturing choices and procedures and product specifications, thereby unfairly and untimely penetrating the silicon microphone marketplace.

57.     Prior to General MEMS and AAC's duplicating a successful silicon microphone prototype, AAC scheduled several trips for Fenn to travel to China for purposes of meeting with AAC's Chinese designers, operators and retailers. Specifically, Du and Meng inquired into specific baking temperatures and material specifications related to the silicon microphone. Fenn, often unsure of the exact measurements and specifications, at AAC's behest would verify such information through his contacts still employed by Knowles as professional engineers, allowing Fenn to supply critical detailed engineering information.

58.     Over a series of business trips, meetings, email correspondence, and telephone communications, Defendants unfairly and improperly gained years of research and development information regarding trade secret and confidential proprietary information relating to Knowles' silicon microphone, including price lists, supplies list, business policies, procedure manuals, manufacturing choices and procedures, and production specifications.

59.     Defendants deliberately induced and coerced Fenn and other Knowles' employees into providing Defendants with trade secret and confidential proprietary information with full knowledge and intent to acquire the information by improper means.

60.     Defendants conduct was malicious, willful and wanton and reprehensible to any reasonable person.

61.     This inevitable reliance on Knowles' trade secrets has given Defendants a substantial competitive advantage. Defendants now know Knowles' suppliers, markets, pricing and strategy. As set forth by the Seventh Circuit in *PepsiCo, Inc. v. Redmond, et al.* 54 F.3d

1262, 1270 (7th Cir. 1995), Knowles "finds itself in the position of a coach, one of whose player has left, playbook in hand, to join the opposing team before the big game."

62.     Upon information and belief, AAC and General MEMS relied upon the confidential proprietary information and trade secrets disclosed by Fenn and, inevitably, utilized such knowledge to assist in unfairly penetrating the silicon microphone market and directly frustrating, interfering with and usurping Knowles' business expectancy and relationships.

63.     Upon information and belief, one or more investment companies have recently and/or are currently marketing AAC by claiming that AAC is adopting innovative technologies in introducing the silicon microphone.

64.     AAC's purposeful, deceitful and malicious conduct which included active communications with Fenn to solicit trade secret and confidential proprietary information related to silicon microphone, its active solicitation of Knowles' employees, in violation of known non-compete and nondisclosure agreements, and its intention to utilize such misappropriated information and unfairly penetrate the silicon microphone marketplace clearly illustrates AAC's intent to engage in unfair competition.

## COUNT I
## INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

65.     Knowles realleges as if fully set forth herein the allegations contained in paragraph 1-64 above.

66.     The requested injunctive relief is necessary to preserve the *status quo* or restore the *stat quo ante* and to protect Knowles from immediate, substantial and irreparable injury which it has suffered and will continue to suffer if Defendants are permitted to continue violating Knowles' rights under the Illinois Trade Secrets Act, and Knowles' rights to be free of unfair competition and exploitation.

17

67.   Knowles has no adequate remedy at law and is likely to prevail on the merits.

68.   No bond is necessary since Knowles is a substantial business enterprise and, should injunction issue and later be overturned, Knowles is capable of paying any damages caused by any wrongfully issued injunction.

WHEREFORE, Knowles prays for an entry of a judgment in the form of the following relief in the form of preliminary injunction pending the final trial on the merits and permanent injunction thereafter:

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are restrained in any manner, either directly or indirectly, from producing or manufacturing the silicon microphone or any related product;

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are restrained in any manner, either directly or indirectly, from utilizing any misappropriated trade secret and confidential proprietary information related to the Knowles' silicon microphone;

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are restrained in any manner, either directly or indirectly, from contacting any vendors or suppliers of Knowles' silicon microphone parts or components;

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are restrained in any manner, either directly or indirectly, from contacting any current or prospective customers of Knowles' silicon microphone for the purpose of promoting, evaluating or selling a silicon microphone to such current or prospective customer;

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are restrained in any manner, either directly or indirectly, from contacting, by any means whatsoever, Knowles' current or former employees whose work relates in any capacity to the silicon microphone;

- Defendants, their agents, employees, attorneys, and all persons acting in concert or participation with them, are to return to Plaintiff any and all information, in any form whatsoever, memorandum, handwritten notes, note pads, emails, sketches, documents and/or computer or electronically generated or stored data or drawings regarding Knowles silicon microphone and related price lists, including but not limited to formulas, supplies list, business policies, procedure manuals, product designs and design solutions; and

•       For other such relief as this Court deems just and appropriate.

## COUNT II
## VIOLATION OF ILLINOIS TRADE SECRETS ACT- 765 ILCS 1065/1 et seq., AGAINST ALL DEFENDANTS

69.     Knowles realleges as if fully set forth herein the allegations contained in paragraph 1-68 above.

70.     As a result of Fenn's employment with Knowles, Fenn received special training and exposure to trade secret and confidential proprietary information related to the silicon microphone. In his employment with Knowles, Fenn inevitably gained, used and disclosed to Defendants Knowles' trade secrets related to silicon microphone technology and packaging. Such use and disclosure without Knowles' consent is a violation the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA").

71.     As previously described, Knowles has taken reasonable efforts to maintain the confidentiality of its trade secrets.

72.     Knowles derives independent economic value from its trade secrets not being generally known to, and not being readily ascertainable though proper means by, other persons who could obtain economic value from its trade secrets.

73.     The improper use and disclosure of Knowles' silicon microphone trade secret and confidential proprietary information by Fenn to Defendants will damage Knowles by actually depriving it or threatening to deprive it of, the economic value generated by not having its trade secrets known to others. Knowles stands to lose cost savings that would otherwise flow from its exclusive ability to use its trade secrets, its competitive advantage in the market place, revenues, profits and business opportunities.

74.     Fenn's intention to work for Defendants and Defendants' active solicitation of Fenn and other current key Knowles' employees reflects Defendants disregard of Knowles' rights under ITSA and evidences their intent to violate Knowles' statutory rights.

75.     Defendants' use and disclosure of Knowles' trade secrets constitutes misappropriations under the Act.

76.     AAC's employment of Fenn and other Knowles' employees under these circumstances renders it equally culpable under the Act.

77.     The threatened and inevitable violations of the Act identified above threaten to cause, have caused, and will continue to cause injury to Knowles.

78.     Defendants conduct and threatened use and disclosure of Knowles' trade secrets and confidential information regarding the silicon microphone is malicious, willful and wanton.


WHEREFORE, Plaintiff KNOWLES ELECTRONICS, LLC, prays for relief as follows:

- For compensatory, actual, special and economic damages in an amount in excess of $1,000,000 to be proven at trial;

- For punitive damages in an amount in excess of $1,000,000;

- For the costs of the proceedings herein and pre-judgment interest allowable by law; and

- For other such relief as this Court deems just and appropriate.

Respectfully submitted,

By: _____

One of the Attorneys for Plaintiff, KNOWLES
ELECTRONICS, LLC

Dean A. Dickie, ARDC No. 0631744
Harry N. Arger, ARDC No. 6198806
Gwen M. Geraghty, ARDC No. 6216124
Michelle B. Fisher, ARDC No. 6277061
Timothy M. Morella, ARDC No. 6257444
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

21



1

## INVENTION / NON – DISCLOSURE AGREEMENT

In consideration of the employment of ___JEFFREY W. FEDD___

(the "Employee") by KNOWLES ELECTRONICS, LLC. or a subsidiary of Knowles Electronics, LLC. (herein referred to separately and collectively as the "Company"), Employee does hereby covenant and agree with the Company as follows:

**Section 1:** Employee shall devote his best efforts to perform such duties as are assigned to him within the scope of the Company's business. There shall be included in Employee's duties involvement in the invention, development, improvement and patenting or copyrighting for the Company's sole benefit of any and all products, devices, processes, designs and software relating to the Company's business.

**Section 2:** Employee shall promptly and fully disclose in writing to the company and not to anyone else, all inventions, improvements, and ideas conceived, discovered or developed by Employee, solely or jointly with others, throughout the period from the date hereof to the termination of Employee's employment by the Company during or outside of regular hours of work, that are within the scope of or pertaining to the Company's business (collectively, the "work product"). In consideration of Employee's employment or retention of employment, Employee further agrees to and does hereby assign any and all of the work product to the Company, and the work product shall, upon being conceived, discovered or developed, automatically become the sole and exclusive property of the Company regardless of whether the Company delays or fails to assert its rights therein or obtain patents or copyrights thereon. Employee further agrees, at the Company's request, to execute any and all applications for patents or copyrights for the work product and all assignments and other papers for the purpose of vesting title in the Company to the work product and patent or copyright applications, patents or copyrights covering the work product, to furnish any and all testimony, affidavits and information, and assist the Company in every proper way, entirely at the Company's expense, to obtain and enforce for its own benefit patents or copyrights on the work product in any and all countries. Employee further agrees that after the termination for any reason of his employment by the Company, he will, at the Company's request, at reasonable times and for reasonable compensation by the Company, do things specified herein for the protection of the work product and the issuance and enforcement of said patents or copyrights for the benefit of the Company.

**Section 3:** Employee hereby agrees to refrain from disclosing to any third person or using for the benefit of himself or any third person from the date hereof through the period of his employment by the Company and thereafter, any confidential information or facts or trade secrets obtained or learned by him during and in connection with his employment. Upon termination of his employment, then at that time, Employee agrees that he will not take with him any records of any kind pertaining to the business of the Company, such as records of sales or customers, or any drawings, prints, models, charts, bulletins, notebooks, reports or other papers of any kind, or copies of such papers, used by Employee or to which he has had access during or in connection with his employment by the Company, it being agreed that any and all such reports, drawings, prints, models, charts, bulletins, reports, notebooks, other papers, or other information shall at all times be the property of the Company.

Exhibit A

2

INVENTION / NON-DISCLOSURE AGREEMENT

**Section 4:** Employee consents to any assignment which the Company may make of this Agreement or the rights of the Company hereunder and the assignment by the Company of any work product covered by this agreement, or any patent or copyright application, patent or copyright covering such work product to any person, firm or corporation, and further consents to any successive assignments thereafter, and agrees that any such assignee shall have all the rights and privileges of the Company hereunder in the same manner and to the same extent as though this Agreement had been originally made with such assignee. This Agreement shall be binding upon and inure to the benefit of Employee and the Company and their respective heirs, legatees, personal representatives, successors and assigns. The term "subsidiary" as used herein means any corporation as to which Knowles Electronics, LLC. owns a majority (in value and in voting control) of the corporation's outstanding capital stock.

**Section 5:** The company hereby notifies Employee pursuant to the Employee Patent Act of the State of Illinois that this Agreement does not apply to the work product for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless (a) the invention relates (i) to the business of the Company, or (ii) to the Company's actual or demonstrable anticipated research or development, or (b) the work product results from any work performed by the Employee for the Company.

IN WHITNESS WHEREOF, Employee has hereunto set his hand this ___1 5ᵗ____

day of __October__ 20_01_.

_Angie Palomo_ _____            _____Jeff W. Fein_____
                     Witness                              Employee

_____
                     Witness

ACCEPTED:
KNOWLES ELECTRONICS, LLC.

By:_Angie Palomo_____

Dated: _____October 1___, 20 01

08/06/01



## NON-COMPETITION AGREEMENT

KNOWLES ELECTRONICS, LLC., or a subsidiary of KNOWLES ELECTRONICS, LLC., ("Employer") and ___JEFFREY W. FENN___ , ("Employee"), in consideration of Employers' (hiring of) (promotion of) Employee and allowing Employee access to Employer's customers and confidential business information in order for Employee to perform all necessary job functions, and other good and valuable consideration, the Employer and Employee agree as follows:

1. Employer will allow Employee access to Employer's customers and all confidential business information necessary for Employee to perform the duties and responsibilities of his/her job.

2. Employee will sign this agreement and the "Confidentiality Agreement" and "Security Information" form to be provided by Employer along with this agreement.

3. Upon the termination of Employee's services under this Agreement for any reason whatsoever, whether with or without cause, Employee shall not directly or indirectly call on, solicit, or otherwise deal with any account or customer of the Employer with respect to any line of products sold by Employer within 12 months of the date of termination, or otherwise engage in any business competitive with Employer for a period of twelve (12) months. Directly or indirectly engaging in any competitive business shall include but not be limited to engaging in business as owner, partner, agent, or as an employee of any person or firm, corporation or other entity engaged in such business, or in being interested directly or indirectly in such business conducted by any person, firm, corporation, or other entity.

4. Employee further acknowledges that the foregoing restrictions placed upon him/her are necessary and that in the event that his/her services for the Employer should terminate for any reason, he/she will be in a position to earn a livelihood without violating the foregoing restrictions, and that it has been made clear to him/her on behalf of the Employer that his/her ability to earn a livelihood without violating such restrictions is a material condition to the Employer entering into this Agreement.

5. Employee agrees that Employer's damages arising out of any Employee breach of this Agreement would be very difficult to establish and, that Employer would have no adequate remedy at law. Therefore, Employee agrees that Employer shall be entitled to equitable relief in court to enjoin Employee from breaching any of the covenants contained in this Agreement.

6. The provisions of this Agreement are severable and if any provision is found to be unenforceable, that shall not effect the enforceability of the balance of the Agreement.

Employer:

By: ___Carol Dragno___

Employee: ___Jeffrey W. Fenn___   ___10/11/01___
                                          Date:

LISLE\05961.3
ID\TBC

Exhibit B



## SECURITY INFORMATION

Our company's information is one of our most important assets. It represents a tremendous investment in time, effort, and money. Protection of this proprietary information is vital to maintaining our competitive edge and to safeguarding our future and out jobs. Its protection requires the active cooperation and participation of each of us.

*How well are you contributing to this effort? This brief checklist advises you of key procedures.*

### AROUND THE OFFICE

- When communicating with others about company matters, ensure that the other party HAS THE NEED TO KNOW THE INFORMATION. This is especially important when forwarding e-mail messages.
- Desks and files must be locked when you're away from your area for an extended period of time during the workday, and locked at the end of the day.
- Gossiping or spreading rumors about company matters must be avoided.
- All company procedures must be followed on the marking, handling, and storage of sensitive materials.
- All sensitive materials including notes and jottings must be disposed of properly.
- Sensitive information appearing on flip charts, blackboards, and other open displays must be removed immediately after use.
- Photocopying and fax machines security procedures are areas of concern, extra caution must always be used, including insuring that no original or copies are left at machines and that the waste copies of sensitive papers are properly handled.
- Unidentified individuals, mysterious circumstances, and missing items should be reported to a Supervisor or the Human Resources Department.
- Pick up the documents you print immediately. Don't leave documents sitting in printers.
- Shred papers that contain sensitive information.

### ON THE TELEPHONE

- Know the identity of the party at the other end of the line.
- Determine whether there is a safer method of providing the information to the other party.
- Ensure that the other party has a "need to know" the information being discussed.
- Refer all telephone press inquiries to a single company source-Human Resources.

### DEALING WITH OUTSIDERS

- Visitors must always be escorted and limited to non-sensitive areas.
- Limit communications with vendors and suppliers to a "need to know" basis.
- Vendors dealing with sensitive information must sign confidentiality agreements.

ISSUE DATE: 10/1/81                                                                         1

Exhibit C