KNOWLES ELECTRONICS, LLC,      )
                                    )
           Plaintiff,          )     No. 06 C 6213
                                      )
      v.                       )
                                    )     Judge Edmond E. Chang
AMERICAN AUDIO COMPONENT     )
INC., *et al.*,                     )
                                    )
          Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Knowles Electronics and the related defendant entities, American Audio Components and AAC Technologies Holdings (for convenience, they will be referred to together as "AAC"), disagree as to the proper interpretation of a settlement agreement.[1] Years ago, Knowles and AAC settled a number of pending and threatened intellectual-property claims, all stemming from AAC's manufacture of what Knowles characterizes as a knock-off Knowles microphone. *See* R. 169, Second Am. Compl.; R. 254, Knowles Compl. at Exh. B, Settlement Agreement.[2] As part of the Settlement Agreement, the parties cross-licensed their respective patents and AAC agreed to pay royalties to Knowles on certain products incorporating Knowles' intellectual property. Settlement Agreement § 2.

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1332. *See also* R. 253, 6/7/16 Order; R. 295, 3/8/17 Op. at 2 n.2.

[2]Citations to the docket are indicated by "R." followed by the docket number and, where applicable, a page or paragraph number.

The parties abided by the Settlement Agreement for several years without incident. In 2016, however, Knowles brought this enforcement action against AAC, claiming that AAC was withholding royalties in violation of the Settlement Agreement. *See* Knowles Compl. ¶¶ 90-91. AAC responded with various counterclaims, requesting judicial interpretation of the Agreement, as well as a declaratory judgment of noninfringement on two Knowles patents and no royalties owed on a number of specific products. *See* R. 260, Defs.' Countercl. The resolution of the enforcement dispute rested entirely on contractual interpretation of the Settlement Agreement, so the parties brought cross-motions for judgment on the pleadings, R. 278, Pl.'s Mot. for J. on the Pleadings; R. 284, Defs.' Mot. for J. on the Pleadings, and the Court read the Agreement to unambiguously require the continued payment of royalties, R. 295, 3/8/17 Op. AAC now moves for reconsideration of that decision. R. 301, Defs.' Mot. for Reconsideration. For the reasons stated below, the motion to reconsider is denied.

## I. Background

As in the Opinion deciding the cross-motions for judgment on the pleadings, the Court takes all well-pled allegations as true and draws all reasonable inferences in the nonmovant's favor. *Hayes v. City of Chi.*, 670 F.3d 810, 813 (7th Cir. 2012). But here, the material facts are not in dispute. Instead, the parties' motions turn entirely on the interpretation of the words in the contract.

The facts of the original intellectual-property litigation and the current enforcement dispute are laid out in detail in the prior Opinion, R. 295, so there is no

need to repeat all of that here. Only the most pertinent details—that is, the disputed language in the Settlement Agreement—are included in this Opinion.

The Agreement resolved a number of legal actions that Knowles and AAC were pursuing against one another in 2006 and 2007. Settlement Agreement at Preamble. These included a lawsuit filed in this district, a threated patent-infringement complaint to the United States International Trade Commission, and two patent-related proceedings in China. *Id.* at Preamble, § 3; Knowles Compl. ¶ 75; R. 260, Defs.' Ans. ¶ 75. As partial consideration for the dismissal of existing claims and the release of future claims, the Settlement Agreement granted AAC a royalty-bearing license to use the "Knowles Patents," defined as:

> United States Patent No. 6,781,231 B2 (the "'231 Patent"), United States Patent No. 7,242,089 B2 (the "'089 Patent") United States Patent No. 7,166,910 (the "'910 Patent"), and any patents that share an application in common with these patents or claims the benefit of the same filing date as these patents, including all continuations, divisions, reissues, re-examinations and world-wide corresponding patents.

Settlement Agreement § 1.4; *see also id.* § 2.1. Royalties would be computed in accordance with a two-tier payment structure, with the applicable rate dependent on whether a product was a "First Tier Royalty Product" or a "Second Tier Royalty Product" and on the amount of AAC's aggregate net sales to date on the royalty products. *Id.* §§ 1.5, 2.3-2.6.

The core of the enforcement dispute rests on the definitions of "First Tier Royalty Products" and "Second Tier Royalty Products." First Tier Royalty Products incorporate the '231 Patent:

> First Tier Royalty Products shall mean AAC microphones … within the scope of, or covered by, the language of any claim of the '231 Patent including, without limitation, Part Numbers: SM0102, SM0301, SM0301L, SM0301EL, SM0401L, SM0401EL, SDM0102, SDM0301, SDM0401 and SDM0501.

Settlement Agreement § 1.5(A). Second Tier Royalty Products incorporate the '089 and '910 Patents:

> Second Tier Royalty Products shall mean AAC microphones … within the scope of, or covered by, the language of any claim of the '089 or '910 Patents including, without limitation, Part Numbers SM0102B, SM0102BL, SM0301BL, SM0301BEL, SM0401BL, SM0401BEL, SDM0102B, SDM0301B, SDM0401B, and SMD0501B.

*Id.* § 1.5(B). The definition went on to clarify that products acknowledged as incorporating *both* the '231 and '089 or '910 Patents were to be considered First Tier Royalty Products and were explicitly excluded from the Second Tier Royalty Products category. *Id.*

Had the scope of the Knowles Patents remained static, there would have been no issue. But in March 2014, the Patent and Trademark Office reexamined the '089 Patent and cancelled all but one of the then-existing claims (Claim 5), although it later added additional claims (Claims 30-61). R. 260-4, Defs.' Ans. and Countercl. at Exh. E, 3/5/14 Inter Partes Reexam. Cert.; R. 260-4, Defs.' Ans. at Exh. F, 4/2/14 Ex Parte Reexam. Cert. AAC took this to mean that it no longer had to pay royalties on the products covered by the cancelled claims, Knowles Compl. ¶ 93; Defs.' Countercl. ¶¶ 22-23, and stopped paying royalties on Part Numbers SM0102B, SM0401BL, and SDM0401B. According to AAC, these three Part Numbers were solely covered by the cancelled '089 Patent claims, Defs.' Countercl. ¶ 24, but

Knowles denies this, R. 272, Pl.'s Ans. to Countercl. ¶ 24, so there is some dispute over whether the disputed Part Numbers fall inside the scope of the reexamined '089 Patent. Nonetheless, Knowles maintains that the Settlement Agreement expressly requires royalties on those specific Part Numbers, irrespective of any reexaminations or claim cancellations. *See* Knowles Compl.

Knowles sued for breach of contract, Knowles Compl., and AAC countersued for a declaratory judgment confirming its obligation to pay royalties only on those products within the scope of *current* claims of the '089 Patent and '231 Patent (the latter of which was reexamined in 2015, and—as far as the record shows—remains pending on appeal before the Federal Circuit), Defs.' Countercl. The parties filed cross-claims for judgment on the pleadings, each arguing that the Settlement Agreement unambiguously supported its own interpretation. Pl.'s Mot. for J. on the Pleadings; Defs.' Mot. for J. on the Pleadings. The Court held that (1) the Agreement was unambiguous, and could therefore be construed without looking at extrinsic evidence; and (2) based on the language of the Agreement, the cancellation of certain claims of the Knowles Patents did not affect AAC's obligation to "pay royalties on, at the very least, the specified Part Numbers [SM0102B, SM0401BL, and SDM0401B]." 3/8/17 Op. at 11. Therefore, AAC had improperly withheld royalties and needed to pay. AAC now moves the Court to reconsider its decision pursuant to Federal Rule of Civil Procedure 54(b).

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) states that a court may reconsider an interlocutory ruling "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed R. Civ. P. 54(b). Motions for reconsideration serve the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987). Thus, a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). But a motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("[R]econsideration is not for rehashing previously rejected arguments.").

## III. Analysis

AAC argues first that the prior Opinion did not draw reasonable inferences in favor of AAC, as required under the Rule 12(c) standard, when considering Knowles' motion for judgment on the pleadings. AAC also contends that the prior Opinion

failed to consider AAC's arguments as to the patent-misuse doctrine when interpreting the Settlement Agreement. There is some overlap between these two arguments, because they both go towards AAC's contention that its reading of the Agreement is at least *a*—if not the *only*—reasonable interpretation. But because the arguments involve very different legal analyses, the Court will address them separately and in turn.

## A. Failure to Draw Reasonable Inferences in AAC's Favor

First, AAC argues that the prior Opinion incorrectly applied the legal standard for a Rule 12(c) motion, which requires "all reasonable inferences" to be drawn "in favor of the nonmovant."[3] *See Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016); Defs.' Br. at 5-9. The Opinion did set forth that standard of review, R. 295 at 8-9, so what AAC really contends is that the Opinion did not "address the arguments that AAC's construction [of the Agreement] is" plausible, so reconsideration is appropriate. R. 320, Defs.' Reply Br. at 4 (emphasis omitted); *see also Rothwell Cotton*, 827 F.2d at 251 (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 664-55 (N.D. Ill. 1983), *aff'd*, 736 F.2d 388 (7th Cir. 1984)).

Before tackling the substance of this argument, the Court makes one preliminary note: previous drafts of the Agreement cannot factor into the analysis of whether the contract is ambiguous, nor can they provide the grounds for arguing that the apparent meaning of a facially unambiguous contract is unreasonable.

---

[3]Where, as here, the parties have filed cross-motions for judgment on the pleadings, the Court adopts a "'dual perspective[,]' [] resulting sometimes in the denial of both motions." *Bechtold v. Physicians Health Plan of N. Ind., Inc.*, 1993 WL 625573, at *3 n.3 (N.D. Ind. Mar. 19, 1993), *aff'd*, 19 F.3d 322 (7th Cir. 1994) (citation omitted).

Indeed, the Agreement contains an explicit integration clause, Settlement Agreement § 9.6, so AAC may not use outside evidence to establish an "extrinsic ambiguity." *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999). Instead, the Agreement is ambiguous only if—based solely on the language of the contract—it is "susceptible to more than one meaning."[4] *Id.* at 884.

AAC contends that—with all reasonable inferences properly drawn in its favor—its interpretation of the Agreement would have prevailed or, at the very least, been found just as reasonable as the one offered by Knowles. Defs.' Br. at 5-9. But this argument misapprehends the Rule 12(c) standard. The Court must take "reasonable *factual* inferences in favor of the" nonmovant, *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (emphasis added), but the Court "is not bound by the non-moving party's *legal* characterizations of the facts," *Legion Ins. Co. v. Vemuri*, 1997 WL 757529, at *2 (N.D. Ill. Nov. 24, 1997) (emphasis added) (citing *Republic Steel Corp. v. Penn. Eng'g Corp.,* 785 F.2d 174, 177 n.2 (7th Cir. 1986)). Here, the parties do not dispute the operative terms of the Agreement. The only issue is whether the contract is ambiguous and, if it is not, what obligations it imposes on the parties. This is a matter of law. *See Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 634-35 (7th Cir. 2012). As a result, "the task

---

[4]Relying on *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1266 (7th Cir. 1984), AAC incorrectly contends that "Illinois decisional law provides that even when a contract is integrated on its face, it might require discovery and trial to determine its proper construction." Defs.' Reply Br. at 5 (internal quotation marks omitted). That was the case when *Sunstream* was decided, but the Illinois Supreme Court has since expressly disavowed this "provisional admission approach" of interpreting expressly integrated contracts. *See Air Safety*, 706 N.E.2d at 885; *see also River's Edge Homeowners' Ass'n v. City of Naperville*, 819 N.E.2d 806, 810 (Ill. App. Ct. 2004).

of drawing reasonable inferences … [is] greatly simplified," because those inferences are irrelevant to the matter at hand. *See Bechtold v. Physicians Health Plan of N. Ind.*, 1993 WL 625573, at *3 n.3 (N.D. Ind. Mar. 19, 1993), *aff'd*, 19 F.3d 322 (7th Cir. 1994) (resolving cross-motions for judgment on the pleadings in breach of contract claim).

What AAC *means* to argue, perhaps, is not that the Opinion failed to draw reasonable factual inferences in its favor, but that the Opinion should have held that AAC's interpretation is a reasonable one. Contrary to AAC's assertion that the Opinion "fail[ed] to undertake that analysis" at all, *see* Defs.' Reply Br. at 2-3, the Opinion explicitly stated that "the definitional text and other provisions of the Settlement Agreement dictate *only one reasonable reading*," requiring AAC to continue paying royalties on the disputed Part Numbers. 3/8/17 Op. at 11 (emphasis added). That is, the Court considered AAC's interpretation and rejected it as unreasonable. *Id.*; *see also Thompson v. Gordon*, 948 N.E.2d 39, 48 (Ill. 2011) ("a contract is not rendered ambiguous merely because the parties disagree on its meaning"). There was no mistake in apprehension, so this argument cannot support a motion for reconsideration.[5] *See Bank of Waunakee*, 906 F.2d at 1191.

---

[5]AAC also argues that the Opinion made an error of apprehension when it (allegedly) construed the parties' dispute as involving the *overall* validity of the '089, '910, and '231 Patents. Defs.' Br. at 10 (citing 3/8/17 Op. at 11 ("The parties differ over whether the definition of the Royalty Products, be they in the First Tier or Second Tier, are dependent on the *validity* of the various patents. Nothing in the text of the definitions suggests that validity of the patents matters … ." (emphasis in original))). In context, "validity of … the patents" plainly means the validity of the various *claims* of the patents. The parties and the Court all acknowledged the overall validity of the '089 and '231 Patents (and neither party mentioned any reexamination of the '910 Patent, nor did the Court). *See* 3/8/17 Op. at 6-7 (noting that at least some claims of the '089 and '231 Patents survive).

## B. Failure to Consider the Patent Misuse Doctrine

AAC's second argument for reconsideration has more force. Specifically, AAC contends that, even if the language of the Settlement Agreement otherwise supports Knowles' interpretation, that interpretation is unreasonable because it violates federal patent policy. Defs.' Br. at 10-13. The prior Opinion did not address this argument, but the Court will do so here.

Federal law prohibits "patent misuse," which "occurs when the scope of an otherwise valid patent monopoly extends beyond the prescribed boundaries of the patentee's control." *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015) (citations omitted). One form of *per se* patent misuse is an "arrangement[] in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." *Cnty. Materials Corp. v. Allan Block Corp.*, 502 F.3d 730, 734 (7th Cir. 2007) (citations omitted). This rule was first articulated in *Brulotte v. Thys Co.*, where the Supreme Court deemed unenforceable a patent license for the use of farm machinery insofar as the license required the licensees to pay royalties accrued "after the last of the patents incorporated into the machines had expired." 379 U.S. 29, 30 (1964). Recently, the Supreme Court confirmed that *Brulotte* remained good law and applied its holding to a settlement agreement that contained a royalty-bearing patent license. *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401 (2015).

---

With both parties and the Court accepting the validity of the *patents*, the change in circumstance that prompted this dispute could only concern the validity of various patent *claims*. Indeed, based on the motion for reconsideration and its corresponding briefs, AAC appears to have well understood the Opinion's use of "validity" as referring to "claim validity."

AAC contends that, if the Settlement Agreement is interpreted to require royalties on Part Numbers no longer covered by a valid claim, the royalty provisions will run afoul of *Brulotte* and *Kimble* and constitute patent misuse. Defs.' Br. at 10-13; R. 285, Defs.' Mot. for J. on the Pleadings Resp. Br. at 8-9. Because it is unreasonable to interpret a contract as leading to illegal results, AAC argues, Knowles' interpretation of the Settlement Agreement cannot be correct.

But there are several problems with this argument. To start (and discussed in more detail below), *Brulotte* and *Kimble* address the accrual of royalties on *expired* patents. They do not consider royalties stemming from cancelled claims of otherwise valid, unexpired patents. The federal courts of appeals have addressed cases with facts that come closer to this particular situation, but none has read *Brulotte* and *Kimble* as requiring it to strike down settlement provisions calling for royalties on cancelled claims. (In fact, some cases suggest that collecting royalties on products covered by cancelled claims does *not* constitute patent misuse if the patent itself remains valid.) Finally, the reasoning behind the Supreme Court's recent decision to approve *Brulotte* weighs in favor of allowing Knowles to continue collecting royalties on the disputed Part Numbers, even if they are not covered by the reexamined '089 Patent. The Court will address each of these issues in turn.

### 1. *Brulotte* and *Kimble*

At first glance, *Kimble* appears a close analogue to the present case. There, as here, the dispute arose out of a settlement agreement that resolved a patent-related litigation between the parties. *Kimble*, 135 S. Ct. at 2406. In the settlement, the

alleged infringer purchased the patent at issue and agreed to pay the patent holder a royalty on all future sales of products using that patent. *Id.* The parties soon disagreed as to the proper calculation of royalties, however, and the patent holder sued for breach of the settlement agreement. *Kimble v. Marvel Enters., Inc.*, 727 F.3d 856, 859 (9th Cir. 2013). The purchaser countersued for a declaratory judgment that it had no obligation to pay royalties past the date that the patent was to expire. *Id.*.

The case ended up in front of the Supreme Court, where the purchaser argued for the overruling of *Brulotte* (which had attracted extensive criticism over the decades). *Brulotte*'s detractors argued that the decision amounted to an economically unsound restraint on the freedom to enter contracts. *See Kimble*, 135 S. Ct. at 2406; *see also, e.g., Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1017-18 (7th Cir. 2002). But the Supreme Court declined to jettison *Brulotte*, reasoning that (1) *Brulotte*'s doctrinal underpinnings had not changed, so there was no statutory basis to ignore *stare decisis*; and (2) even if the economic assumptions behind *Brulotte* were misguided, the ruling provided a useful bright-line rule that was easy for judges to apply and for parties to contract around. *Kimble*, 135 S. Ct. 2401. So the Supreme Court reaffirmed *Brulotte* and held that post-expiration royalties could not be enforced. *Id.* at 2411.

AAC cites *Brulotte* and *Kimble* as part of its argument against Knowles' interpretation of the Settlement Agreement. That is, Knowles' interpretation of the Agreement cannot be reasonable, because it is—according to AAC—contrary to the

holdings of these two cases. Defs.' Br. at 10; Defs.' Mot. for J. on the Pleadings Resp. Br. at 8. It is true that, "[a]s a general principle of contract law, statutes and laws in existence at the time a contract is executed are considered part of the contract. It is presumed that parties contract with knowledge of the existing law." *Braye v. Archer-Daniels-Midland Co.*, 676 N.E.2d 1295, 1303 (Ill. 1997) (citations omitted). In Illinois, contract interpretations that "render[] the agreement enforceable rather than void [are] preferred." *Id.* (citation omitted); *see also FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) ("Nonsensical interpretations of contracts … are disfavored … because people are unlikely to make contracts … that they believe will have absurd consequences."). But—importantly—"the contractual language [must] *reasonably allow*[] such an interpretation." *Lo v. Provena Covenant Medical Center*, 796 N.E.2d 607, 615 (Ill. App. Ct. 2003) (emphasis added). And the Court has already held that AAC's interpretation of the Settlement Agreement is not reasonable. 3/8/17 Op. at 11.

What's more, "a contract should not be deemed illegal unless it is *expressly* contrary to the law or public policy." *Braye*, 676 N.E.2d at 1303 (emphasis added). Because of the importance of the freedom to enter contracts, "the power to declare a private contract invalid on public policy grounds is exercised sparingly." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 645 (Ill. 2011). But neither *Brulotte* nor *Kimble* directly prohibits Knowles from collecting royalties on the disputed Part Numbers, even if they are no longer covered by the reexamined '089 Patent. Both of those cases involved disputes over post-*expiration* royalties. *Kimble*, 135 S. Ct. at 2411;

*Brulotte*, 379 U.S. at 33-34. The Settlement Agreement complies with their holdings: AAC need pay royalties only "until expiration of … [the] '231 Patent" (for First Tier Royalty Products) and "until expiration of the last to expire of any '089 and '910 Patent" (for Second Tier Royalty Products). Settlement Agreement § 2.3-2.6. But neither *Brulotte* nor *Kimble* extends its holding to royalty obligations arising out of invalidated claims of unexpired patents.[6] As a result, they are not controlling (much less "expressly" so) on the facts of this case.

AAC also cites *Lear, Inc. v. Adkins* for the proposition that a licensee cannot be forced to pay royalties "without regard to the validity of the Patent Office's grant." Defs.' Br. at 11 n.1 (citing 395 U.S. 653, 672 (1969)). But *Lear*, too, is distinguishable. First of all, *Lear* involved a discrete patent license, 395 U.S. at 657, not a settlement agreement,[7] *see* Settlement Agreement at Preamble (noting that the Agreement's purpose is to "settle and resolve the Litigation and to reduce the possibility of any further litigation"[8]). Settlements versus patent licenses are

---

[6]In fact, *Brulotte* envisioned a workaround of its bright-line rule (approvingly cited in *Kimble*, 135 S. Ct. 2408) in which the parties license (and calculate royalties on) a bundle of patents. 379 U.S. at 30. Then the royalties "may run until the latest-running patent covered in the parties' agreement expires." *Kimble*, 135 S. Ct. at 2408. As applied to the Settlement Agreement, this suggests that, even if the '089 were entirely invalidated, Knowles could arguably still collect royalties on Second Tier Royalty Products: AAC's royalty obligation continues "until expiration of the last to expire of any '089 and '910 Patent," Settlement Agreement § 2.3-2.6, and there is no indication that the '910 Patent has expired or that any of its claims have been invalidated, *see* Knowles Compl. ¶ 180, Defs.' Ans. ¶ 180.

[7]AAC represents that "[t]he Court … recognized the 2007 Agreement as a patent license, even if it was born out of filed and threatened cases alleging infringement." Defs.' Reply Br. at 5. The Opinion did not do that. In fact, the Opinion referred to the agreement as a "Settlement Agreement" throughout and characterized the license as but one "*term*[] of the Settlement Agreement," 3/8/17 Op. at 1 (emphasis added).

[8]AAC's suggestion that the purpose of the Settlement Agreement was not to settle the parties' trade secrets and patent infringement claims, Defs.' Reply Br. at 6-7

14

governed by different case law and different policy considerations. *See* Section III.B.2. Secondly, *Lear* considered invalidation of the *entire patent*, not of a subset of the patent claims. 395 U.S. at 658. As AAC has acknowledged itself, Knowles' patents "remain valid" and there is a material difference between an entirely invalid patent and the invalidity of specific claims within a patent. *See* Defs.' Br. at 10 (arguing that the Court erred by misapprehending the parties' dispute as one of patent validity, not the "scope of the claims of the identified patent"). So none of the three Supreme Court cases on which AAC relies directly governs this dispute.

That said, even if Knowles' *interpretation* of the Agreement should not be disfavored because it is not "clearly contrary" to the authorities cited by AAC, *see Phoenix Ins.*, 949 N.E.2d at 645, additional analysis of *Brulotte* and *Kimble*'s progeny is needed. The Court must determine if judgment was properly granted in Knowles' favor on AAC's claims for declaratory judgment of no royalties owed on the '089 and '231 Patents. *See* Pl.'s Mot. for J. on the Pleadings; Defs.' Countercl. ¶¶ 47-52 (Count 3), ¶¶ 53-59 (Count 4). That is because, even if the Agreement required payment of royalties on specific Part Numbers covered by invalidated claims, that

---

(characterizing Knowles' trade secrets complaint as "a dead letter, with little settlement value"), is not reasonable. The Agreement is titled "Settlement, Release, and Cross-License Agreement" and states the parties' intentions to "settle and resolve the Litigation and to reduce the possibility of any future litigation," Settlement Agreement at Preamble. The Agreement itself was the product of "a series of settlement discussions and a mediation … that ultimately led to the settlement herein." *Id.* Its purpose could not be clearer. Perhaps AAC means to imply that, of the settled claims, *its* claims against Knowles were more meritorious than Knowles' claims against AAC, so the impetus behind the settlement was *Knowles*' desire to avoid a judgment in AAC's favor. But that does not square with the Agreement's asymmetric imposition of royalty obligations: AAC had to pay for the use of Knowles' patents, Settlement Agreement § 2.1, 2.3-2.6, but granted Knowles royalty-free use of AAC's patents, *id.* § 2.2.

provision would be unenforceable if it amounted to patent misuse. *See Brulotte*, 379 U.S. at 34; *Kimble*, 135 S. Ct. at 2406. So whatever interpretation of the Agreement wins out, if there is case law that persuasively extends *Brulotte*'s reasoning to an analogous situation, then there is no royalty obligation. The Supreme Court has not answered the question at hand, so the Court now turns to other federal case law.

## 2. Application in Federal Courts

An examination of how the federal circuit courts have interpreted *Brulotte*, *Kimble*, and *Lear* does not help AAC's argument. No circuit court has held that *Brulotte* and its kin prohibit a patent holder from collecting royalties, pursuant to a settlement agreement, on products that are covered by cancelled claims of otherwise unexpired patents. In fact, although there does not appear to be case law addressing this exact situation, the case law that *is* available weighs in favor of Knowles.

The fact that AAC's royalty obligations arise out of a settlement agreement and not a pure patent license is crucial. *Brulotte* stressed the need to limit patent holders from extending their monopolies beyond the statutory period so that they cannot unduly constrain the "free market visualized for the post-expiration period." 379 U.S. at 32. Later, in *Kimble*, the Supreme Court underscored the public interest in "ensuring public access to discoveries" as an important policy goal driving its decision to uphold *Brulotte*. 135 S. Ct. at 2406-07.

But in this case, there is another important policy goal in play. The federal courts have consistently held that encouraging settlements is a significant interest that can, at times, trump patent-law considerations. For example, although no-

challenges clauses (which bar licensees from challenging the validity of the licensed patent) are unenforceable as part of stand-alone licensing agreements, *Lear,* 395 U.S. at 673-74, they *are* enforceable as part of settlements, *see, e.g., Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1361 (Fed. Cir. 2010) ("*Lear* does not render such [no-challenge] agreements unenforceable, because of the strong policy in favor of settlement of litigation … ."). So "while the federal patent laws favor full and free competition in the use of ideas in the public domain over the technical requirements of contract doctrine, settlement of litigation is more strongly favored by the law." *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369 (Fed. Cir. 2001) (citation omitted); *see also Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d 974, 978 (7th Cir. 1973) (federal patent "policy must occupy a subsidiary position to the fundamental policy favoring the expedient and orderly settlement of disputes and the fostering of judicial economy."). So the conflict here is not between federal patent policy and state contract law, as characterized by AAC, *see* Defs.' Br. at 10, but between federal patent policy and the policy "favor[ing] the finality of judgments generally and the encouragement of settlements of litigation in particular," *see Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 477 (Fed. Cir. 1991).

*Hemstreet v. Spiegel* offers a look at how the conflict between these policies has been resolved in practice. 851 F.2d 348 (Fed. Cir. 1988). There, the licensee obtained a patent license—as part of a settlement agreement—and in exchange promised to pay royalties "notwithstanding that said patents-in-suit may be held invalid and/or unenforceable at any other proceeding at a later date." *Id.* at 349.

Later on, the patents were held unenforceable in an unrelated federal lawsuit. *Id.* So the licensee petitioned for relief from its obligation to make any future payments under the settlement agreement, citing the outcome of the separate suit and arguing that "it would be inconsistent with federal patent policy to require [the licensee] to continue to pay royalties for a license under a patent that has been held unenforceable." *Id.* at 349-50. But the Federal Circuit rejected this argument, concluding that the licensee was bound to the language of agreement. *Id.* at 351. *Hemstreet* acknowledged the importance of the "public interest favoring full and free competition in the use of ideas which are in reality a part of the public domain," *id.* (citing *Lear*, 395 U.S. at 670), but another interest superseded it: "the encouragement of settlement of litigation and the need to enforce such settlements in order to encourage the parties to enter into them," *Hemstreet*, 851 F.2d at 350.[9]

Here, the Court has held that the terms of the Settlement Agreement unambiguously require AAC to continue paying royalties on three Part Numbers identified as Second Tier Royalty Products (SM0102B, SM0401BL, and SDM0401B), irrespective of the '089 Patent reexamination. 3/8/17 Op. at 11. By specifically listing these Part Numbers as Royalty Products, Settlement Agreement

---

[9]Of course, the apparent supremacy of settlement promotion over patent policy is not absolute; after all, the perpetual-royalty clause rejected in *Kimble* was part of a settlement agreement. *See* 135 S. Ct. at 2406. And *Kimble* was decided well after *Hemstreet*, so if the two conflicted directly, *Kimble* would control. But there is no direct conflict in the precedent. And the facts of *Kimble* were such that the balance between patent policy and pro-settlement policy fell lopsidedly in favor of the former. There, the patent holder attempted to obtain rights via settlement that it could *never* have held under the patent statutes—that is, a *perpetual* right to exclude. *Id.* What's more, the parties did not dispute whether, independent of the settlement agreement, the allegedly infringing product would be covered by the patent after expiration (it of course would not); so no judicial or litigative resources were needed to litigate infringement or claim construction. *Id.*

§ 1.5(B), AAC "contractually agreed—in exchange for valuable consideration"—to pay royalties on them "implicitly regardless of whether … [the claims covering them] are valid or invalid." *See Panduit Corp. v. HellermannTyton Corp.*, 2004 WL 1898954, at \*3 (N.D. Ill. Aug. 11, 2004) (settlement agreement continued to bar alleged infringer from producing products "covered by any claim of" a disputed patent during the reexamination process, so long as the patent remained "alive"); 3/8/17 Op. at 11. Because the Agreement settled pending litigation, Settlement Agreement at Preamble (describing the purpose of the Agreement); § 3.2 (dismissal of claims); § 4.1-4.3 (mutual releases), it served an important policy interest and the parties ought to be bound to their obligations. AAC has not identified—nor has the court found—case law that renders the Agreement's royalty provisions unenforceable.

In fact, the way that the Agreement defines royalty-bearing products—listing certain Part Numbers as First Tier or Second Tier Royalty Products to eliminate any ambiguity as to their "covered" status—represents an additional safeguard against running afoul of the patent-misuse doctrine. At least one circuit has allowed parties to *agree* that certain products are covered by a patent—regardless of later changes in the patent's scope. In *Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, the Tenth Circuit held that, because the parties' settlement agreement defined certain products as utilizing the licensed technology, the court could order the licensee to pay royalties on those products without conducting an infringement analysis to determine if they actually fell under the patent's claims. 762 F.3d 1016,

1022–23 (10th Cir. 2014) (as a general rule, "if a product does not infringe a patent, then the patent holder cannot demand royalties," but "that … does not prevent the parties from *agreeing* that a royalty is due on a non-infringing product if doing so would benefit the convenience of the parties") (emphasis added); *see also Glasstech, Inc. v. AB Kyro OY*, 1989 WL 151672, at *4 (N.D. Ohio May 13, 1989) (holding that, where patent holder and licensee were party to a consent judgment stipulating that the "patent is valid," licensee was required to pay royalties on the patent "even should the Patent Office reject the claims of the [] patent or a court find it to be invalid").

So in summary: there is reason to think that parties to a settlement agreement can contractually stipulate that certain products are covered by a patent—which AAC and Knowles appear to have done with Part Numbers SM0102B, SM0401BL, and SDM0401B and the '089 and '910 Patents—despite specific claims in the patents later being deemed invalid. In any case, the existing case law does not explicitly prohibit the payment of royalties on products falling outside a reexamined patent, where the underlying patent remains unexpired and the payment obligations arise out of a settlement agreement. So *Brulotte* and *Kimble* are distinguishable, and the Court's "task is not to expand *Brulotte*'s holding beyond its terms." *See Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1020 (9th Cir. 2007). Unless "*Brulotte* and its progeny" directly apply, the Court "shall endeavor to give effect to the intent of the parties and the bargain that they struck." *See id.* (allowing royalties beyond expiration of patents because the contract provided for royalties on

the sale of the *invention* not on "the claims described in and identified by the 1931 patent").

### 3. Policy Considerations

There is another point in Knowles's favor: allowing Knowles to enforce the Settlement Agreement would mean applying a bright-line rule, and a similar goal of simplicity also underlies *Brulotte* and *Kimble*. In *Kimble*, the Supreme Court reaffirmed *Brulotte* in part because of the prior decision's "workability." 135 S. Ct. at 2411. *Brulotte* was "simplicity itself to apply": "A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* This bright-line rule compared favorably against the patent holder's proposed alternative, which required an "elaborate inquiry" that would produce "notoriously high litigation costs and unpredictable results." *Id.* (citation omitted).

Apply those considerations here: AAC urges that the Settlement Agreement constitutes *per se* patent misuse, even though some of the patent's claims are still valid and unexpired. Under AAC's proposed rule, even though a settlement agreement expressly identified certain products as "covered by" a patent, the accused infringer could in effect re-open the litigation every time a patent underwent a reexamination resulting in the cancellation of some but not all of its claims. All of the previously-agreed "covered" products would be up for grabs again. The licensee could argue that any number of its previously royalty-bearing products was covered only under a cancelled claim, so it no longer needs to pay. And the

patent holder would have no choice but to litigate the claim construction—not only robbing the previous settlement of its finality, but eating up considerable judicial and litigative resources. *See* Cassandra E. Havens, *Saving Patent Law from Competition Policy and Economic Theories:* Kimble v. Marvel Entertainment, 31 Berkeley Tech. L.J. 371, 393 (2016) (noting that "efficiency is especially important" "[i]n patent litigation" because "[p]atent trials require an additional procedure of claim construction[,] … [t]he median time for a patent case to reach trial is 2.4 years, and the cost of patent litigation is also very high").

Of course, the parties could try to work around this by agreeing ahead of time that Product A is covered by Claim 1, Product B is covered by Claim 2, and so on. But this would not necessarily keep a lid on litigation of what had been a settled dispute. If the Patent and Trademark Office cancels a claim that covers a royalty-triggering product, then the patent holder can petition to add *new* claims to re-encompass that product. *See, e.g., Artemi Ltd. v. Safe-Strap Co.*, 2013 WL 6860734, at *1, *4 (D.N.J. Dec. 30, 2013) (patent holder did not commit patent misuse when it "sought reexamination of … [its] patent with the express purpose of re-writing the patent claims to encompass" alleged infringer's product (citing *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942), *abrogated on other grounds by Ill. Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006))); *Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 923 (D. Minn. 2010) (although defendant "discern[ed] a sinister motive in [plaintiff's] amendment of claims during the reexamination to cover the accused devices," amendments were not improper);

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1998) (it is not "in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application"). In fact, that might have happened here: although the PTO cancelled all but one of the '089 Patent's original claims, 3/5/14 Inter Partes Reexam. Cert. at 2, Knowles successfully added 31 additional claims, 4/2/14 Ex Parte Reexam. Cert. at 1. If the new claims are approved, then the parties go back to claim construction—requiring their time and resources, as well as those of the federal courts, to determine whether the disputed product falls under the new claims. So adopting AAC's proposed extension of *Brulotte* to the facts of this case would achieve the opposite practical outcome: it would "make the law less, not more, workable than it is now." *See Kimble*, 135 S. Ct. at 2411.

Not only does AAC's proposed rule lack *Brulotte*'s workability, it also undermines another important value of the court system, namely, giving the parties certainty. *Brulotte*'s bright-line rule allowed parties to bargain around it in order to achieve their desired business ends. *See Kimble*, 135 S. Ct. at 2414 ("As we have explained, *Brulotte* leaves open various ways—involving both licensing and other business arrangements—to accomplish payment deferral and risk-spreading alike."); *id.* at 2408 (listing possible contractual workarounds). The contracting parties know each licensed patent's statutory expiration date with certainty. That expiration date serves as a clean cut-off on royalty accrual. So the terrain is clear; the parties need only agree as to their preferred route.

Not so under AAC's proposal. Predicting the timing of a patent's future reexaminations and the outcomes of those reexaminations is far harder than determining a patent's expiration date—especially because challenges can come not just from the accused infringer in a particular lawsuit, but from non-parties to the litigation as well. So the scope of a patent holder's and would-be licensee's respective property rights is murky under AAC's proposal. This, combined with the high transaction costs of litigating a post-reexamination claim construction (as discussed above), makes the bargains envisioned in *Kimble* very difficult to achieve.

Indeed, it is far from clear that AAC's proposal actually would end-up benefitting patent licensees. True, if some of a patent's claims are later invalidated, that may free a licensee from its contractual obligation to pay royalties on products that were covered under the cancelled claims. But this is an entirely *ex post* perspective. Consider the contractual incentives *before* a settlement agreement is arrived at: knowing that a later reexamination may render the royalty provisions of a settlement agreement unenforceable, a patent holder might very well demand a higher royalty in order to settle, or demand a front-loaded payment schedule, or both. The costs of introducing uncertainty into the length of a product's royalty-bearing life could end-up being borne by licensees. In the case of cash-poor licensees, it might cut them out of otherwise mutually beneficial settlement agreements altogether.

One final note: a common concern with affirming (or, in this case, declining to narrow) patent rights is the potential to stifle innovation by protecting

unmeritorious patents. But that is not a problem here. If certain patent claims are so obviously weak that an accused infringer can reasonably anticipate their subsequent cancellation, then the infringer's rational move is not to settle the claim, pay royalties, and hope that someone else petitions the PTO to reexamine those exact claims. It is to file the reexamination petition itself, or litigate the invalidity of the particular claims in the district court case. Rejecting AAC's patent-misuse argument does not protect weak patents; it merely holds AAC to the bargain it struck, instead of allowing it to re-open, in effect, the settled litigation due to cancellation of some of the claims in two of the patents.

## IV. Conclusion

For the reasons stated above, AAC's motion for reconsideration, R. 301, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 23, 2017